**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

REGINALD DAVIS                                                              PLAINTIFF

v.                                 **Case No. 4:19-cv-00643-LPR**

**PULASKI COUNTY ARKANSAS,** *et al.*                          DEFENDANTS

## ORDER

Pending before the Court is a Motion for Summary Judgment by separate Defendants Turn Key Health Clinics, LLC ("Turn Key") and Diedra Vester, LPN ("Nurse Vester").[1]   In his Complaint, Plaintiff Reginald Davis alleges that Turn Key and Nurse Vester committed medical malpractice.[2]  Mr. Davis alleges that Nurse Vester gave him the wrong type of insulin, setting off a chain of events that eventually led to the infection and amputation of Mr. Davis's right leg.  Turn Key and Nurse Vester move for summary judgment, arguing that Mr. Davis has failed to support his medical malpractice claims against them with expert opinion.  Turn Key and Nurse Vester say that Arkansas law requires expert opinion in a case like the one at bar.  Turn Key and Nurse Vester are correct.  The Court GRANTS summary judgment for Turn Key and Nurse Vester.

---

[1]   Defs.' Mot. for Summ. J. (Doc. 22).

[2]   Mr. Davis originally brought claims under 42 U.S.C. § 1983 against Turn Key, Nurse Vester, Pulaski County, Arkansas, Eric S. Higgins, Debra Ann Dillard, Nicole Nelson, and Andrew McEwen.  Pl.'s Compl. (Doc. 1).  Turn Key and Nurse Vester moved to dismiss.  Defs.' Mot. to Dismiss (Doc. 5).  The Court dismissed without prejudice the § 1983 claims against Turn Key and Nurse Vester; the Court did not dismiss the claims of medical malpractice against Turn Key and Nurse Vester.  Order (Doc. 17).  The Court gave Mr. Davis forty-five days to seek leave to amend his Complaint.  *Id.* at 12.  Mr. Davis declined to do so.  Pulaski County, Arkansas, Eric S. Higgins, Debra Ann Dillard, Nicole Nelson, and Andrew McEwen did not move to dismiss the Complaint.  When Turn Key and Nurse Vester filed for summary judgment, the other Defendants had not yet moved for summary judgment.  They filed a separate Motion for Summary Judgment on February 15, 2021.  Defs.' Mot. for Summ. J. (Doc. 32).

**Background**

Mr. Reginald Davis was diagnosed in 2000 as an insulin-dependent diabetic.[3]   He was prescribed (among other medications) "HumuLIN N U-100 INJ 3ML,"[4] which Mr. Davis describes as a "slow-acting" insulin.[5]   Mr. Davis testified that over the years he has received different types of insulin.[6]   Sometimes he would receive "longer-acting" insulin and sometimes he would receive "regular insulin for specific instances."[7]   In July of 2017, Mr. Davis was arrested and taken to the Pulaski County Regional Detention Facility ("Pulaski County").[8]   Later, in November of 2017, he was transferred to the Arkansas Department of Corrections ("ADC") for a parole violation, where he spent six months.[9]

On the date of the initial event at issue in this case—September 22, 2017—Mr. Davis was held at Pulaski County.[10]   Nurse Vester came to Mr. Davis's cell at 4:54 a.m. to give him his daily dose of insulin.[11]   Mr. Davis believes and testified that Nurse Vester gave him the wrong type of insulin; that is, he believes that Nurse Vester gave him an injection of the fast-acting insulin.[12]   The medical chart listing Mr. Davis's medications shows that he was given the same insulin that morning as he had been given on other days.[13]   But Mr. Davis testified that, based on his experience

---

[3]   Ex. C to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28-1) at 4.

[4]   Ex. D to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-4) at 4; Ex. A to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-1) at 1.

[5]   Ex. A to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 17.

[6]   *Id.* at 2-3.

[7]   *Id.* at 3.

[8]   *Id.* at 9-10.

[9]   *Id.* at 10.   Mr. Davis testified that he spent six months in the ADC.   *Id.*   His Complaint states that he was released from the ADC on August 1, 2018.   Pl.'s Compl. (Doc. 1) ¶ 42.

[10]   Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶¶ 6, 11.

[11]   *Id.* ¶ 11; Ex. D to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-4) at 10.

[12]   Ex. A to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 17.

[13]   Ex. D to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-4) at 10.

as a diabetic and based on the events that occurred after he got the injection, he knew that it was the incorrect insulin. He stated that "[t]his has never happened in my life. I'm talking about: I never have passed out or fell out or nothing. I know when I haven't received the right insulin. When I fell, once I hit the wall, I knew that she gave me the wrong dose. I knew that."[14] When asked how he knew that, Mr. Davis responded, "[r]egular would have dropped it right in a minute. N won't. N is slow-acting. Regular is fast, so fast it will knock you out."[15]

In his Complaint, Mr. Davis alleges that before he was given a shot of insulin, his blood sugar was measured at 164.[16] He repeats this statement in the Response to the Statement of Materials Facts.[17] However, he does not cite to, and the Court has not found, any evidence as to his blood sugar measurement before his shot. After receiving the insulin shot, Mr. Davis laid back down in his cell bed.[18] At 5:13 a.m., Deputy Dillard ordered Mr. Davis to exit his cell to receive his food tray.[19] Mr. Davis stood up from his bunk and fell; he testified that "when [he] stood up, [he] hit the wall. And once [he] hit the wall, [he] pushed the door and [he] fell. And pretty much that was the last thing [he] remember[s] at that time."[20] In his Complaint, Mr. Davis alleges that his blood sugar had dropped from 164 to 28.[21]

---

[14]   Ex. A to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 17.

[15]   *Id.*

[16]   Pl.'s Compl. (Doc. 1) ¶ 28.

[17]   Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 11.

[18]   Ex. A to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 11.

[19]   Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 6; Ex. B to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28-1) at 2.

[20]   Ex. A to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 11.

[21]   Pl.'s Compl. (Doc. 1) ¶ 28. Nurse Marsha Warren's medical notes from that day state that Mr. Davis's blood sugar dropped as low as 26. Ex. F to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28-1) at 14.

When Mr. Davis passed out, he fell to the floor in such a way that he injured his ankle.[22] Mr. Davis recounted that, while he lay on the floor, he observed his foot had twisted.  He testified the following: "[a]nd I looked down, and my ankle was turned all the way – I mean, my foot was turned all the way to the right, but the ankle was sitting on the right there."[23]  As he lay on the floor, Nurse Vester rubbed the back of his neck and repeated, "I'm sorry."[24]  Mr. Davis recalls that Deputy Debra Ann Dillard told him, "don't you move, don't you move."[25]  Deputy Dillard called a "Code Red," which is used as a signal for a medical emergency.[26]  Deputies and Turn Key staff on the scene observed his ankle injury.[27]  He asked what happened and one of the nurses said he "came in like that," and "another nurse told her, '[n]o, he did not.'"[28]  Nurse Marsha Warren recorded her observations:

> Inmate's right ankle looked deformed; Inmate's right foot was completely turned to the right side of foot as in dislocated & also inmate never shed one drop of sweat during this hypoglycemic episode; given 2 fast acting glucose tabs; rechecked BS: dropped to 26; Fed an orange: BS 36; Fed 2 glucose fast acting tabs, another orange, & started on a sandwich, at 0535 BS 88; inmate assisted to cell, limping on right leg; but inmate had manipulated foot to normal position.[29]

---

[22]   Ex. A to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 14.

[23]   *Id.* at 14.

[24]   Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 11; Nov. 24, 2020 Dep. of Reginald Davis at 41.

[25]   Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 7; Ex. A to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 11.

[26]   Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 6; Ex. B to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28-1) at 2.

[27]   Ex. B to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28-1) at 2; Ex. A to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 18.

[28]   Ex. A to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 14.

[29]   Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 11; Ex. F to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28-1) at 14.

Mr. Davis recounted that he was given oranges and orange juice to try to get his blood sugar to the appropriate level.[30]  Mr. Davis denies that he was given an icepack for his ankle or that he was told to elevate it.[31]  Mr. Davis stated that he could not recall whether he was able to reposition his ankle into its normal position.[32]

According to Mr. Davis, he was placed back into his cell and did not immediately receive further treatment for his ankle.[33]  For example, no x-rays were performed and Mr. Davis did not receive pain medication.[34]  Nor was he was seen by a doctor or taken to a hospital at that time.[35] Nurse Warren completed a Turn Key medical communication form the day of Mr. Davis's injury.[36] She checked the box for, "[m]edically cleared to remain in unit."[37]  She did not check the boxes for "[r]equires outside care. Injury" nor for "[i]njury complained of or observed."[38]  On another medical form Nurse Warren completed that day, the form stated that "[p]rovider approval must be obtained prior to administration of any medication, x-rays, crutches, slings."[39]

---

[30]  Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 7; Ex. A to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 12.

[31]  Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 7.

[32]  Ex. A to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 15.

[33]  Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 8; Ex. C to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-3) at 67:1-9.

[34]  Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 11; Ex. E to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28-1) at 13; Ex. C to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-3) at 67:1-9, 68:16-23.

[35]  Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 11; Ex. C to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-3) at 67:1-9, 68:16-23.

[36]  Ex. E to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28-1) at 13.

[37]  *Id.*

[38]  *Id.*

[39]  Ex. E-2 to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 24.

Several days passed before Mr. Davis's ankle received further medical attention.[40]   On September 26, 2017 (four days after the incident), Mr. Davis filed a sick call request, asking for medical treatment for his ankle.[41]   On September 27 and September 29, 2017, Mr. Davis filed grievances for lack of medical care for his ankle injury.[42]   On September 29, 2017, he was taken to the University of Arkansas for Medical Sciences ("UAMS"), where the examining doctor observed that Mr. Davis had an "open fracture of [the] distal end of [the] right fibula . . . ."[43]   The UAMS medical report from that visit stated that an x-ray was completed, Mr. Davis's ankle was splinted, and that he was discharged with crutches.[44]   The report directed, "[t]o follow up with orthopedics for definitive surgical intervention," and listed a plan to "[s]chedule an appointment as soon as possible for a visit in 3 days."[45]

In his Complaint, Mr. Davis alleges that UAMS advised him that he "needed to have surgery in order to repair his ankle" and that UAMS "is believed to have provided a date for" Mr. Davis's surgery.[46]   Mr. Davis further alleges in his Complaint that "in an effort to avoid incurring this medical expense, the defendants 'fast-tracked'" Mr. Davis to the ADC.[47]   Mr. Davis provided no evidence to support that he was offered a date for the surgery during this September UAMS visit.   The only evidence provided to the Court on this issue is the aforementioned medical report

---

[40]   Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 8; Ex. C to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-3) at 67:1-9.

[41]   Ex. H to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 28.

[42]   Ex. F to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 26; Ex. G to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 27.

[43]   Ex. I to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 29.

[44]   *Id.*

[45]   *Id.* at 29-30.

[46]   Pl.'s Compl. (Doc. 1) ¶ 37.

[47]   *Id.* ¶ 38.   At that time, the ADC also had a parole hold on Mr. Davis.   Ex. A to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 10.   As noted below, Mr. Davis was sent to the ADC on November 9, 2017.

that says that Mr. Davis was "[t]o follow up with orthopedics for definitive surgical intervention" and to "[s]chedule an appointment as soon possible for a visit in 3 days."[48]  It is true that Mr. Davis was transferred to the ADC in November of 2017.[49]  But there is no record evidence to support the allegation that he was "fast-tracked" or that he was transferred to avoid medical follow-up.

Mr. Davis's next medical report from UAMS is dated October 27, 2017.[50]  The report noted that he had an appointment at the UAMS Orthopedic Clinic on October 10, 2017, "but missed his appointment because he is incarcerated and was not transported to [the] clinic."[51]  The report described his splint as "softened" and "falling apart."[52]  The report described Mr. Davis as continuing "to have pain over his lateral malleolus" and having "developed numbness after the fall" which had "not changed since the incident."[53]  Mr. Davis returned to UAMS on October 31, 2017.[54]  The medical report from that visit noted that x-rays showed a "[r]ight fibula fracture with syndesmotic widening."[55]  The report stated that the fracture "[n]eeds surgical fixation asap."[56]

Mr. Davis was sent from Pulaski County to the ADC on November 9, 2017 to serve his six-month parole violation sentence.[57]  On November 17, 2017, Mr. Davis returned to UAMS for surgery to repair his ankle.[58]  Dr. Ruth Thomas performed the operation and noted the following:

---

[48]   Ex. I to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 29-30.

[49]   Ex. A to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 10.

[50]   Ex. J to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 31.

[51]   *Id.*

[52]   *Id.*

[53]   *Id.*

[54]   Ex. K to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 32-33.

[55]   *Id.* at 32.

[56]   *Id.* at 33.

[57]   Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 9; Ex. A to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29-1) at 10.

[58]   Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 9;  Ex. D to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28-1) at 11-12.

"Fibula fracture in 3 three larger pieces with anterior tibia fibula ligaments on most anterior fragment.  With fixation of the fibula the syndesmosis was still wide.  According, syndesmotic screws added.  Three placed as patient has diabetes and the bone was very soft."[59]  Mr. Davis's repaired ankle was placed in a short-leg splint.[60]

Defendants' Expert Disclosures contain expert reports that allude to medical records from Baptist Health leading up to Mr. Davis's amputation.[61]  The Court has not been provided those records, nor any other evidence regarding the status of Mr. Davis's ankle between the time of initial ankle repair surgery and his release from the ADC, or after his release and before the amputation.  Mr. Davis's Complaint states that he was released from the ADC on August 1, 2018,[62] which was about nine months after his surgery.  Mr. Davis argues that due to his diabetes and "the fact that the walking boot was rubbing against his ankle," he contracted an infection in his right ankle.[63]  In November of 2018, Mr. Davis had his right leg amputated due to the infection.[64]  The Court has been provided with no evidence regarding when this infection started, how it developed, or how amputation became necessary.

On September 18, 2019, Mr. Davis filed his Complaint against Defendants.[65]  In December of 2019, Turn Key and Nurse Vester moved to dismiss.[66]  On March 20, 2020, the Court granted

---

[59]   Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 9; Ex. D to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28-1) at 11.

[60]   Ex. D to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28-1) at 12.

[61]   Ex. C to Defs.' Statement of Facts (Doc. 24-3) at 3; Ex. D to Defs.' Statement of Facts (Doc. 24-4) at 2.

[62]   Pl.'s Compl. (Doc. 1) ¶ 42.

[63]   Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29) at 6.

[64]   Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 10.

[65]   Pl.'s Compl. (Doc. 1).

[66]   Defs.' Mot. to Dismiss (Doc. 5).

in part and denied in part the Motion to Dismiss.[67]  The Court dismissed without prejudice the §

1983 claims against Turn Key and Nurse Vester.[68]  The Court did not dismiss the medical

malpractice claims.[69]  On May 4, 2020, the Court entered an Amended Final Scheduling Order.[70]

The Order set the deadline for case-in-chief expert disclosures for November 16, 2020.[71]  The

deadline for rebuttal expert disclosures was set for December 16, 2020.[72]  Mr. Davis did not

identify an expert witness for his case or to rebut Defendants' case.[73]

Turn Key and Nurse Vester identified two medical experts to support their case:[74]  Dr. John

Adams, II and Dr. Owen Kelly.[75]  Their Expert Disclosures stated that Dr. Adams would:

> testify that LPN Vester and Turn Key's medical and nursing staff
> complied with the standard of care applicable to a jail medical
> provider practicing in Little Rock, Arkansas, or a similar locality as
> it relates to the medical and nursing care provided to Reginald Davis
> during his incarceration at the Pulaski County Regional Detention
> Facility, particularly from September 22, 2017 forward.[76]

The Expert Disclosures further stated that Dr. Adams would testify "that the care of Mr. Davis

provided by Turn Key and its medical and nursing staff was not a proximate cause of Mr. Davis's

ultimate injury and subsequent amputation."[77]

---

[67]  Order (Doc. 17).

[68]  *Id.* at 12.

[69]  *Id.*

[70]  Final Scheduling Order (Doc. 20).

[71]  *Id.* at 1.

[72]  *Id.*

[73]  Pl.'s Resp. to Defs.' Statement of Facts (Doc. 28) ¶ 13.

[74]  *Id.* ¶ 14.

[75]  Ex. B to Defs.' Statement of Facts (Doc. 24-2) at 1-2.

[76]  *Id.* at 2.

[77]  *Id.*

Dr. Adams's expert report noted that medical records "confirm that Mr. Davis received the appropriate dose" of insulin.[78]  His expert report stated the following:

> First, the medication administration records (MARs) confirm that Mr. Davis received the appropriate dose of a 30u injection of HumaLIN N U-100 insulin in his right triceps around 4:45 a.m. on September 22, 2017, by Nurse Vester.  This dose and type of insulin were appropriate and consistent with the insulin prescribed for Mr. Davis and which he had been regularly receiving during his incarceration.  This is a longer acting insulin commonly used in both prison and private settings for diabetic patients like Mr. Davis.  It is not "neutral," "regular," or "fast-acting" insulin as characterized by Mr. Davis in his complaint.   Nurse Vester appropriately administered this medication as prescribed for Mr. Davis, which was within the standard of care for a licensed practical nurse practicing in a jail context like the Pulaski County Regional Detention Facility and comparable facilities.  Since there was no breach of the standard of care by the administration of this insulin, neither Nurse Vester nor any medical staff with Turn Key caused Mr. Davis's later fall and ankle injury.[79]

Dr. Adams also opined that Defendants did not breach the proper standard of care.[80]  Dr. Adams described Defendants' treatment of Mr. Davis's injury as reasonable and appropriate.[81]  His expert report opined:

> Next, Turn Key medical staff promptly and reasonably responded to Mr. Davis's cell after notified by jail personnel of his fall around 5:15 a.m. on September 22nd.  Nursing staff took appropriate steps to check Mr. Davis's blood sugar and to provide glucose tablets and oranges to stabilize his blood sugar.   Likewise, nursing staff reasonably and appropriately assessed his apparent ankle injury, instructing him to apply ice, elevate the ankle, and follow-up with medical staff if the ankle's condition failed to improve.  Of note, Mr. Davis manipulated his foot back to normal position and was only experiencing pain that he described as "4/10" immediately after the incident.

---

[78]   Ex. C to Defs.' Statement of Facts (Doc. 24-3) at 2.

[79]   *Id.*

[80]   *Id.*

[81]   *Id.*

> A jail is a very different place for practicing medicine. Because of security issues, there are things that cannot be done. Often in a clinic setting, a walking boot can be used in this circumstance, but that is not common in a jail because the metal in walking boot can be pried off and used as a weapon. This conservative management with later follow-up was appropriate and within the standard of care.
>
> Nursing staff appropriately and reasonably followed up with Mr. Davis on September 23rd, providing ibuprofen and continuing conservative management. Mr. Davis was scheduled for a follow-up evaluation on September 26th, but apparently declined to be seen at that time. He submitted a sick call request later that same day and was placed on the schedule to be seen by the provider on September 29, 2017. This follow-up visit was reasonable and within the standard of care given the unique context of medical care provided in a jail facility and given that emergent follow-up for Mr. Davis was not warranted in the clinical context.
>
> Once assessed by Nurse Practitioner Kendra Roberts on September 29th, she appropriately ordered an x-ray of Mr. Davis's ankle given his continued complaints of pain and swelling and, upon receipt of the results of that x-ray, she made the reasonable decision to send Mr. Davis to UAMS for further evaluation and intervention, if warranted, by orthopedic specialists. All of this was reasonable and within the standard of care.[82]

The doctor's expert report also stated that Defendants' alleged acts or omissions were not the proximate cause for Mr. Davis's injury or amputation.[83] Instead, the report observed, the causes for Mr. Davis's poor outcome were "his poorly controlled diabetes and smoking."[84] In addition to the poorly controlled diabetes and smoking, "Mr. Davis's surgeon noted his bones were very soft. This indicates osteoporosis . . . ."[85] Osteoporosis "coupled with his diabetes and smoking, leads to poor healing and a poor outcome."[86] Dr. Adams concluded that "Mr. Davis's poor outcome

---

[82] *Id.* at 2-3.

[83] *Id.*

[84] *Id.* at 3.

[85] *Id.*

[86] *Id.*

was due to poorly controlled diabetes, smoking, and undiagnosed osteoporosis."[87]  Dr. Adams opined:

> As mentioned above, I do not believe that conduct by Nurse Vester and the appropriate administration of Mr. Davis's prescribed insulin caused his fall or ankle injury.  Likewise, I do not believe that the reasonable and conservative management of Mr. Davis's ankle injury from September 22nd until he was referred to UAMS on September 29th resulted in any further injury to Mr. Davis. . . .
>
> There were several causes for the poor outcome for Mr. Davis, most importantly his poorly controlled diabetes and smoking.  This was a longstanding problem noted in UAMS records before the fall, such as on February 4, 2014 where his hgA1C was 14.0, which mean an average daily blood sugar of greater than 350 for the last 90 days.  This was very high.  Similarly, after the fall, records at Baptist Health leading up to the amputation noted a similarly high hgA1C of 14.1 on September 5, 2018.  The Baptist Health records are covered with reported extremely elevated blood sugars, elevated hgA1C, and numerous diabetic complications.  His diabetes was not controlled during his recovery, which helps account for the poor outcome of his surgical repair and infection.
>
> Mr. Davis was also a smoker as noted throughout his records.  Smoking delays healing and is a perfect set up for a disastrous surgical outcome, especially where the patient is not compliant with treatment of his other conditions and infection.
>
> Finally, Mr. Davis's surgeon noted his bones were very soft.  This indicates osteoporosis that Turn Key could not have known about as Mr. Davis apparently did not know this.  This disease, especially coupled with his diabetes and smoking, leads to poor healing and a poor outcome.  Moreover, his osteoporosis makes bones very brittle, leads to fractures, and poor healing.  All occurred here with Mr. Davis and was not caused by Turn Key or its medical staff.  It is my opinion within a reasonable degree of medical certainty that Mr. Davis's poor outcome was due to poorly controlled diabetes, smoking, and undiagnosed osteoporosis.[88]

Dr. Adams stated that he held all of his opinions to reasonable degree of medical probability.[89]

---

[87] *Id.*

[88] *Id.*

[89] *Id.*

In addition to Dr. Adams, Defendants listed Dr. Kelly on their Expert Disclosures. Defendants disclosed that Dr. Kelly would "testify that the time between Mr. Davis's September 22, 2017 fall and his emergency department admission did not impact his course of care or cause his ultimate amputation, but rather, that amputation was the result of underlying comorbidities and noncompliance on the part of Mr. Davis."[90]   Defendants further disclosed that "Dr. Kelly is expected to opine that the care of Mr. Davis provided by Turn Key and its medical and nursing staff was not a proximate cause of Mr. Davis's ultimate injury and subsequent amputation."[91]

Dr. Kelly's report stated that he believed there are two key issues to Mr. Davis's medical case.[92]   First, he opined that the time period between the initial accident and Mr. Davis's treatment at UAMS did not play a role in his later amputation.[93]   "Fracture fixation is often delayed for several factors.  Soft tissue integrity is the most common cause of delay . . . . Delay in surgical fixation is not an independent risk factor for infection."[94]   The second issue Dr. Kelly identified was that Mr. Davis had pre-existing health problems.[95]   Dr. Kelly wrote, "[t]he most notable are smoking history and poorly controlled diabetes.  These health problems delay healing and increase the risk of poor bone quality or osteoporosis.  These factors definitely increase the risk of infection with diabetes being an independent risk factor for infection."[96]   Dr. Kelly concluded that the "most

---

[90]   Ex. B to Defs.' Statement of Facts (Doc. 24-2) at 3.

[91]   *Id.*

[92]   Ex. D to Defs.' Statement of Facts (Doc. 24-4) at 3.

[93]   *Id.*

[94]   *Id.*

[95]   *Id.*

[96]   *Id.*

probable cause of the eventual amputation is the poorly controlled health problems with non-compliance."[97]

## **Legal Standard**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.[98]  Conversely, if the nonmoving party can present specific facts by "affidavit, deposition, or otherwise, showing the existence of a genuine issue for trial," then summary judgment is not appropriate.[99]  It is important to understand that "[t]he mere existence of a factual dispute is insufficient alone to bar summary judgment."[100] To prevent summary judgment, the dispute of fact must be both genuine and material.[101]  A genuine dispute of fact exists where a rational jury could decide the particular question of fact for either party.[102]  A material dispute of fact exists where the jury's decision on the particular question of fact determines the outcome of a potentially dispositive issue under the substantive law.[103]

The moving party has the burden of showing that (1) there is an absence of a genuine dispute of material fact on at least one essential element of the nonmoving party's case and (2) the absence means that a rational juror could not possibly find for the nonmoving party on that essential element of the nonmoving party's case.[104]  If the moving party meets that burden, the

---

[97]  *Id.*

[98]  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citing FED. R. CIV. P. 56).

[99]  *Grey v. City of Oak Grove, Mo.*, 396 F.3d 1031, 1034 (8th Cir. 2005).

[100]  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

[101]  *Id.*

[102]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[103]  *Id.*

[104]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

burden then shifts to the nonmoving party to show that there is a genuine dispute of material fact.[105] The nonmoving party meets this burden by designating specific facts in affidavits, depositions, answers to interrogatories, admissions, or other record evidence that shows "there is a genuine issue for trial."[106]  The Court must view the evidence in the light most favorable to the nonmoving party and give the nonmoving party the benefit of all reasonable inferences.[107]  Accordingly, for purposes of the Motion here, the Court considers the most pro-plaintiff version of the record that a reasonable jury could rationally conclude occurred.

A plaintiff in a medical malpractice case bears the burden of proving a medical provider's negligence by a preponderance of the evidence.[108]  To sustain a claim for medical malpractice under Arkansas law, a plaintiff "must prove the applicable standard of care, the defendant's breach thereof, and that the defendant's breach proximately caused injury."[109]  The applicable standard of care is defined as "the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing . . . in the locality in which he or she practices or in a similar locality."[110]  A breach is failure to act in accordance with the applicable standard.[111]  "Proximate cause is that which in a natural and continuous sequence, unbroken by

---

[105]  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *Torgerson*, 643 F.3d at 1042.

[106]  *Celotex Corp.*, 477 U.S. at 322-24.

[107]  *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015).

[108]  *See, e.g., Webb v. Bouton*, 350 Ark. 254, 261-62, 85 S.W.3d 885, 889 (2002).

[109]  *Jones v. McGraw*, 374 Ark. 483, 486, 288 S.W.3d 623, 626 (2008) (citation omitted); ARK. CODE ANN. § 16-114-206.  The Arkansas Supreme Court, in *Broussard v. St. Edward Mercy Health System, Inc.*, struck down language in the statute which required that the expert testimony be provided by a medical care provider of the same specialty as the defendant.  2012 Ark. 14, 386 S.W.3d 385 (2012).  The Court upheld the remaining language of the statute. *Id.*

[110]  ARK. CODE ANN. § 16–114–206(a)(1); *see Skaggs v. Johnson*, 323 Ark. 320, 324, 915 S.W.2d 253, 255 (1996).

[111]  ARK. CODE ANN. § 16–114–206(a)(2).

any efficient intervening cause, produces the injury, and without which the result would not have occurred."[112]

Under Arkansas Code § 16-114-206, "when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge," the plaintiff must use expert testimony to prove the applicable standard of care, breach of that standard, and proximate causation.[113] Conversely, when the asserted negligence does lie within the common-knowledge comprehension of the fact-finder, then expert testimony is not required.[114]  Arkansas courts have a fairly narrow interpretation of what constitutes common knowledge.   For example, common-knowledge negligence includes "a surgeon's failure to sterilize his instruments or to remove a sponge from the incision before closing it."[115]

Summary judgment is appropriate when the plaintiff fails to provide expert witness evidence of the essential elements of a medical malpractice claim where expert testimony is

---

[112]   *Williams v. Mozark Fire Extinguisher Co.*, 318 Ark. 792, 796, 888 S.W.2d 303, 305 (1994).  To show proximate cause, "[i]t is not enough for an expert to opine that there was negligence that was the proximate cause of the alleged damages.  The opinion must be stated within a reasonable degree of medical certainty or probability." *Young v. Gastro-Intestinal Ctr., Inc.*, 361 Ark. 209, 214, 205 S.W.3d 741, 745 (2005) (citing *Williamson v. Elrod*, 348 Ark. 307, 72 S.W.3d 489 (2002)).  An expert opinion is not stated within a medical degree of certainty when it speculates or when it provides possibilities; rather, the expert must render an opinion of medical probability. *Freeman v. Con-Agra Frozen Foods*, 344 Ark. 296, 303, 40 S.W.3d 760, 765 (2001).

[113]   ARK. CODE ANN. § 16–114–206(a)(1); *see Skaggs*, 323 Ark. at 324, 915 S.W.2d at 255.

[114]   *Haase v. Starnes*, 323 Ark. 263, 269, 915 S.W.2d 675, 678 (1996) (quoting *Graham v. Sisco*, 248 Ark. 6, 449 S.W.2d 949 (1970)).

[115]   *Id.*

necessary.[116]  "The moving party is not required to support its motion with affidavits or other materials further negating the plaintiff's claim."[117]

## Discussion

As described in the Background section, there are some genuine disputes of fact in this case.  However, those disputes are not material.  Even taking all of the disputed facts in the light most favorable to Mr. Davis (and giving him the benefit of all reasonable inferences therefrom), this is not a case where the asserted negligence lies within the jury's comprehension as a matter of common knowledge.  Mr. Davis's claims therefore fail at the summary judgment stage because he has put forth no expert testimony to prove the standard of care, breach, or proximate causation.

According to Mr. Davis, his medical malpractice claims against Turn Key and Nurse Vester are based on (1) Defendants' administration of the incorrect insulin, and (2) Defendants' failure to treat Mr. Davis's broken ankle during September 22-29, 2017.[118]  The Court takes each in turn.

### Wrong Insulin

Mr. Davis argues that he received the wrong insulin which caused him to pass out.  He asserts that he knows he received the wrong insulin because he "knows how the types of insulin works in his body."[119]  Mr. Davis also asserts that the blood sugar levels from his tests that morning

---

[116] *Hamilton v. Allen*, 100 Ark. App. 240, 248-49, 267 S.W.3d 627, 634 (2007) ("In *Skaggs v. Johnson* and in *Robson v. Tinnin,* the movants met their burden of proving a prima facie case for summary judgment by showing that the plaintiffs had no expert to testify as to the breach of the applicable standard of care.  In *Brumley v. Naples*, where the appellant's expert on the issue of informed consent could not offer an opinion as to the proper standard of care, the appellant did not meet her burden of proof and no material issue of fact existed.  In *Dodd v. Sparks Regional Medical Center*, summary judgment was appropriate where the affidavit, which offered only a statement of what care should have been provided and an opinion that the health-care providers had failed to exercise due care, did not establish the applicable standard of care.  When the defendant demonstrates the plaintiff's failure to produce the requisite expert testimony, the defendant has demonstrated that no genuine issues of material fact exist and is therefore entitled to summary judgment as a matter of law.") (cleaned up).

[117] *Hamilton*, 100 Ark. App. at 249, 267 S.W.3d at 634.

[118] Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29) at 10.

[119] *Id.* at 11.

show that he started at 164 and then dropped to 28.[120]  Mr. Davis argues that he "has been a diabetic for twenty years, and he could [therefore] explain why" it must have been the wrong type of insulin.[121]  According to Mr. Davis, Federal Rule of Evidence 701 allows Mr. Davis to testify to his opinion as a lay witness when the testimony is based on his experience.[122]  Mr. Davis argues that his testimony on this issue should be admissible under *Burlington Northern Railroad Company v. Nebraska*.[123]

Mr. Davis has not provided an expert witness to explain the proper standard of care, breach, or proximate cause.  Perhaps, if this case went to trial, Mr. Davis might be able to testify as a lay witness under Rule 701 and describe his personal experience with insulin.  But that would not solve the problem raised by the Defendants' Motion.  Mr. Davis's personal experience would not establish "by means of expert testimony"[124] the standard of care, breach, or proximate cause "within a reasonable degree of medical certainty or probability."[125]  Admissibility under a Rule of Evidence is not the same thing as a statutory requirement for medical expert testimony.  Mr. Davis has no medical background or training.[126]  Accordingly, his lay opinion cannot satisfy the statutory requirement.

Which insulin was and should have been administered are not issues within the common knowledge of a jury.  Those two questions, and related sub-questions, require medical expertise.  What are the different types of insulin that are administered?  How are they different?  How does

---

[120]  *Id.*  As noted above, there is no evidence in the record to support the 164 number.

[121]  *Id.*

[122]  *Id.* at 11-12.

[123]  *Id.* (citing *Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1004-05 (8th Cir. 1986)).

[124]  ARK. CODE ANN. § 16–114–206(a)(1).

[125]  *Young*, 361 Ark. at 214, 205 S.W.3d at 745 (citing *Williamson v. Elrod*, 348 Ark. 307, 72 S.W.3d 489 (2002)).

[126]  Ex. C to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-3) at 6:2-22, 60:16-61:5.

a doctor decide which type of insulin to use for a particular patient?  How do different types of insult affect a patient's blood sugar?  How quickly?  How does diet and weight affect this?  How do other pre-existing medical conditions affect this?  How do other medicines interact?  What happens if someone takes the wrong insulin?  Do different people respond differently?  Are there physiological symptoms that are common responses to incorrect doses of insulin?  Jurors may have some limited, general knowledge regarding diabetes and insulin.  But it is far from the type and degree of knowledge necessary to fairly reach a decision in this case.  The claims and facts here require (under Arkansas law) expert testimony to prove a claim of medical malpractice.

<u>Response to the Ankle Injury</u>

Mr. Davis argues that "no medical expert is required to allow a jury to understand what is needed in order to address a broken leg."[127]  He likens the lack of treatment during the seven days between September 22, 2017 and September 29, 2017 to a "surgeon leaving a surgical instrument inside of a patient."[128]  Mr. Davis argues that medical care was obviously needed during this period.  To support this argument, he points to the doctor's visit on September 29, 2017, and the fact that it resulted in Mr. Davis receiving a splint, crutches, pain medication, and a scheduled follow-up visit to plan surgical treatment.[129]

Under Arkansas law, expert medical testimony is necessary to support a medical malpractice claim here as well.  Whether Defendants' treatment of Mr. Davis's injury in the immediate aftermath of his fall and for the next week breached the standard of care are not questions that fit into the common knowledge exception.  Observing a twisted ankle can obviously

---

[127]  Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29) at 10.

[128]  *Id.*

[129]  *Id.*

be an indicator of injury.  But what is the appropriate standard of care in such circumstances, especially in a prison setting?  Were the actions taken by the medical staff immediately after the fall consistent with the standard of care?  How quickly must an ankle injury be treated?  How long of a wait would be too long?  What is the first step in treatment?  What is the second step?  Is a treatment plan affected by the safety considerations of a prison?  Without an expert, there is no explanation for what constitutes an appropriate standard of care for an ankle injury in prison, much less for how, and if, it is different for a patient with diabetes.  Without a standard of care as a barometer for action, there is nothing against which to measure whether breach took place.

Moreover, there is no testimony from a "qualified medical expert that as a proximate result" of the care given after the fall occurred "the injured person suffered injuries that would not otherwise have occurred."[130]  What effect, if any, did the seven day delay have on Mr. Davis's injury?  Did it in any way increase the need for surgery or the potential for amputation a year after surgery?  This is not common knowledge that a jury would possess.  The jury needs information provided by an expert to decide this case.[131]

### <u>Conclusion</u>

Separate Defendants Turn Key and Nurse Vester moved for summary judgment.[132] Defendants' Motion is GRANTED in its entirety.

---

[130]   Ark. Code Ann. § 16–114–206(a)(3).

[131]   Mr. Davis argues that "[i]t is common knowledge that people who are diabetic, are placed in peril of amputation," and that "[a]ny type of injury, could lead to amputation." Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 29) at 13.  Mr. Davis further argues that because it is common knowledge that diabetics have a harder time healing from injuries, "an expert witness is not needed" to show that the alleged improper insulin injection and the alleged lack of appropriate care were proximate causes of the amputation.  *Id.*  The Court disagrees that the diabetic-amputation relationship is within the common knowledge of jurors.  The Court also notes that whether or not this particular issue is within the common knowledge of jurors is something of a red herring.  This question does not even become a live issue until the jurors get past the other issues discussed above, which require expert medical testimony.

[132]   Defs.' Mot. for Summ. J. (Doc. 22).

IT IS SO ORDERED this 8th day of March 2021.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE