**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**REGINALD DAVIS**                                                                           **PLAINTIFF**

**v.**                                         **Case No.: 4:19-cv-643-LPR**

**PULASKI COUNTY ARKANSAS,** *et al.*                                           **DEFENDANTS**

## ORDER

Pending before the Court is a Motion for Summary Judgment by separate Defendants Sheriff Eric Higgins, Sergeant Andrew McEwen, Deputy Debra Dillard, Sergeant Nicole Nelson, and Pulaski County, Arkansas (collectively, the "County Defendants").[1]  Plaintiff Reginald Davis sued the County Defendants under 42 U.S.C. § 1983.[2]  He alleges the County Defendants acted with deliberate indifference with respect to his serious medical needs and thus violated his Eighth Amendment right to be free from cruel and unusual punishment.[3]  The County Defendants move for summary judgment, arguing that Mr. Davis's failure to establish a constitutional violation forecloses both his individual capacity claims and official capacity claims, including his failure-to-train claim.[4]  The Court agrees with the County Defendants and therefore GRANTS summary judgment to the County Defendants.

## I. Procedural Background

This case began with seven defendants: Pulaski County, Arkansas; Sheriff Eric Higgins; Deputy Debra Dillard; Sergeant Nicole Nelson; Sergeant Andrew McEwen; Turn Key Health

---

[1]  Defs.' Mot. for Summ. J. (Doc. 32).  The Court notes that the record does not definitively establish Nicole Nelson's rank.  For the purposes of this Order, the Court will refer to Ms. Nelson as Sergeant Nelson.

[2]  Pl.'s Compl. (Doc. 1) at 1.

[3]  *Id.*

[4]  Defs.' Mot. for Summ. J. (Doc. 34) ¶ 4.

Clinics, LLC ("Turn Key"); and Deirdra Vester, LPN ("Nurse Vester").[5] Mr. Davis alleged that Deputy Dillard, Sergeants Nelson and McEwen, Nurse Vester, and Turn Key acted with deliberate indifference towards him when they did not properly attend to his seriously injured ankle.[6] Mr. Davis also brought a medical malpractice claim against Turn Key and Nurse Vester, alleging that they administered the wrong insulin medication to him and failed to provide adequate care to him subsequent to his ankle injury.[7] Finally, Mr. Davis alleged that Pulaski County, through its sheriff, failed to properly train its staff on how to deal with inmates' medical needs.[8]

Turn Key and Nurse Vester prevailed on two motions, which, taken together, eliminated them from the case. Before discovery, Turn Key and Nurse Vester moved to dismiss Mr. Davis's Complaint.[9] The Court dismissed without prejudice the § 1983 claims against Nurse Vester and Turn Key, finding that those claims did not state viable causes of action.[10] With respect to the § 1983 claim that Nurse Vester violated the U.S. Constitution by giving Mr. Davis the wrong insulin, the Court dismissed that claim without prejudice because the allegations were only that Nurse Vester had made a mistake.[11] With respect to the § 1983 claim that Mr. Davis was not properly cared for after he injured his ankle, the Court explained that the Complaint did not allege that Nurse Vester was part of the Turn Key group that responded to Mr. Davis's ankle injury.[12] As for the § 1983 claims against Turn Key, the Court dismissed those claims without prejudice because Mr. Davis never alleged the existence of a Turn Key policy, custom, or practice that was the

---

[5]  Pl.'s Compl. (Doc. 1).

[6]  *Id.* ¶¶ 50, 51.

[7]  *Id.* ¶¶ 22, 67, 69, 70.

[8]  *Id.* ¶¶ 52, 53.

[9]  Defs.' Mot. to Dismiss (Doc. 5).

[10]  Order (Doc. 17).

[11]  *Id.* at 5.

[12]  *Id.* at 5–6.

moving force behind the alleged constitutional violation.[13]  Moreover, Mr. Davis never alleged that Turn Key failed to train or supervise its staff.[14]  In its dismissal Order, the Court made clear that Mr. Davis might be able to fix the pleading failures in his Complaint, and the Court gave Mr. Davis 45 days to amend his Complaint.[15]  Mr. Davis did not amend his Complaint.

Near the end of discovery, Turn Key and Nurse Vester moved for summary judgment on Mr. Davis's medical malpractice claims, arguing that Mr. Davis could not prevail on those claims without a medical expert's opinion.[16]  Applying Arkansas law, the Court agreed with Turn Key and Nurse Vester and granted summary judgment in their favor.[17]

With Turn Key and Nurse Vester out, Mr. Davis's current case is of necessity focused only on the County Defendants.  Mr. Davis brings individual capacity claims against Deputy Dillard and Sergeants Nelson and McEwen.[18]  Mr. Davis brings official capacity claims against all County Defendants.[19]

## II. Legal Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.[20]  Conversely, if the nonmoving party can present specific facts by "affidavit, deposition, or otherwise, showing the existence of a genuine issue for trial," then summary judgment is not appropriate.[21]  It is important to understand

---

[13]  *Id.* at 6–7.

[14]  *Id.* at 7–8.

[15]  *Id.* at 1–2, 12.

[16]  Order (Doc. 41) at 1.

[17]  *Id.*

[18]  Pl.'s Compl. (Doc. 1) ¶¶ 6, 7, 8.

[19]  *Id.* ¶ 4–8.

[20]  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citing FED. R. CIV. P. 56).

[21]  *Grey v. City of Oak Grove, Mo.*, 396 F.3d 1031, 1034 (8th Cir. 2005).

that "[t]he mere existence of a factual dispute is insufficient alone to bar summary judgment."[22] To prevent summary judgment, the dispute of fact must be both genuine and material.[23]  A genuine dispute of fact exists where a rational juror could decide the particular question of fact for either party.[24]  A material dispute of fact exists where the juror's decision on the particular question of fact determines the outcome of a potentially dispositive issue under the substantive law.[25]

The moving party must show that (1) there is an absence of a genuine dispute of material fact on at least one essential element of the nonmoving party's case and (2) the absence means that a rational juror could not possibly find for the nonmoving party on that essential element of the nonmoving party's case.[26]  If the moving party meets that burden, the burden then shifts to the nonmoving party to show that there is a genuine dispute of material fact.[27]  The nonmoving party meets that burden by designating specific facts in affidavits, depositions, answers to interrogatories, admissions, or other record evidence that shows "there is a genuine issue for trial."[28]  The Court must view the evidence in the light most favorable to the nonmoving party and give the nonmoving party the benefit of all reasonable inferences.[29]  Accordingly, for purposes of the Motion here, the Court considers the most pro-plaintiff version of the record that a rational juror could conclude occurred.

---

[22] *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

[23] *Id.*

[24] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[25] *Id.*

[26] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[27] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Torgerson*, 643 F.3d at 1042.

[28] *Celotex Corp.*, 477 U.S. at 322–24.

[29] *Pedersen v. Bio-Med Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015).

# III. Facts

On July 8, 2017, the Little Rock Police Department arrested Mr. Davis and booked him into the Pulaski County Regional Detention Facility ("PCRDF") on charges of criminal trespass and obstructing governmental operations.[30]  On September 1, 2017, Mr. Davis pleaded guilty to the charges and was sentenced to a 30-day term of confinement, which was to be served at PCRDF.[31]  Thus, on the date of the principal event at issue in this case—September 22, 2017—Mr. Davis was a post-conviction inmate.[32]  Additionally, the Arkansas Department of Correction had a parole hold on Mr. Davis.[33]

Pulaski County deputies receive training related to the provision of medical care to inmates.[34]  Specifically, Pulaski County trains deputies on the "administration of first aid[,] recognizing the need for emergency care in life threatening situations[,] recognizing acute manifestations of chronic illnesses[,] and methods of obtaining medical assistance and referring inmates to health professionals."[35]  Pulaski County contracts with Turn Key for Turn Key to provide medical services at PCRDF.[36]

---

[30]  Pl.'s Resp. to Statement of Facts (Doc. 39) ¶¶ 1, 2, 6.

[31]  *Id.* ¶ 3.

[32]  *Id.* ¶ 5.

[33]  *Id.* ¶ 4.

[34]  *Id.* ¶ 8.

[35]  *Id.*

[36]  *Id.* ¶ 9.  Pulaski County's policies allow "only qualified health care personnel [to] evaluate and care for patients." *Id.* ¶ 11.  Pulaski County maintains that Turn Key is solely responsible for healthcare services provided to inmates. Defs.' Statement of Facts (Doc. 34) ¶ 10.  Mr. Davis disputes this characterization, stating that "[a]lthough PCRDF relies upon the decisions of healthcare professionals to provide medical care to inmates, it still has the responsibility to ensure that pretrial and post-trial detainees receive the necessary medical attention."  Pl's Resp. to Statement of Facts (Doc. 39) ¶ 10.  For the purposes of this Motion, the Court resolves this dispute in Mr. Davis's favor and finds that Pulaski County did not delegate full responsibility of inmate medical care to Turn Key.  Whether Pulaski County could have done so consistent with the Constitution is thus not a question the Court needs to answer.

Per Pulaski County policy, all inmates receive an intake medical screening from a qualified medical provider.[37]  Turn Key conducts these screenings.[38]  Turn Key asks inmates about current illnesses, health problems, medications, and other special needs criteria, such as diabetes.[39]  Mr. Davis's intake screening revealed that he had diabetes, which was controlled by two drugs, Levimir and R Humulin.[40]  The screening also showed that Mr. Davis had an "unstable gait" and used a cane, which led Turn Key to recommend that Mr. Davis be assigned to a lower bunk.[41]

On September 22, 2017, Mr. Davis fell and injured his right ankle.[42]  Here's what happened.  At 5:13 a.m., Deputy Dillard told Mr. Davis to come out of his cell to retrieve his food tray.[43]  While exiting his cell, Mr. Davis fell to the floor.[44]  Deputy Dillard responded to the fall and saw that Mr. Davis's ankle appeared severely swollen.[45]  A minute later, Deputy Dillard called a "Code Red (Medical Emergency)."[46]  In response to the Code Red, three PCRDF staff arrived on the scene: Lieutenant Vannorris Sims and Sergeants Nelson and McEwen.[47]  Five Turn Key personnel responded: Nurses Marsha Warren, Rene Long, Deirdra Vester, Morgan Scott, and

---

[37]  *Id.* ¶¶ 11, 12.

[38]  *Id.* ¶¶ 9, 12, 20.

[39]  *Id.* ¶¶ 13, 15.

[40]  *Id.* ¶¶ 18, 21.

[41]  *Id.* ¶¶ 19, 20.

[42]  *Id.* ¶¶ 24–26.  In his Complaint, Mr. Davis alleges that, in the early morning of September 22, 2017, Nurse Vester mistakenly administered the wrong dose of insulin to Mr. Davis, causing his blood sugar to plummet and leading to his fall.  Pl.'s Compl. (Doc. 1) ¶¶ 22, 27, 28.  As both Turn Key and Nurse Vester are no longer in the case, whether Mr. Davis received the improper medication is not material to Mr. Davis's claims against the County Defendants.

[43]  Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 24.  At the motion hearing, counsel for the County Defendants indicated that Deputy Dillard was a unit deputy, who was regularly assigned to another unit and was filling in at the unit in which Mr. Davis was housed.  June 14, 2021 Hr'g Tr. at 5, 18.  Mr. Davis's counsel did not dispute this.

[44]  Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 25.

[45]  *Id.* ¶ 26; Ex. A to Pl.'s Resp. to Statement of Facts (Doc. 39-1).

[46]  Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 27; Ex. A to Pl.'s Resp. to Statement of Facts (Doc. 39-1).

[47]  Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 28; Ex. A to Pl.'s Resp. to Statement of Facts (Doc. 39-1).

Carmen Simmons.[48]  Sergeants Nelson and McEwen provided extra security while Turn Key personnel assessed Mr. Davis.[49]

Nurse Vester concluded that Mr. Davis experienced a hypoglycemic episode.[50]  Mr. Davis's blood-sugar level was 28.[51]  Mr. Davis testified that his low blood-sugar level rendered him disoriented and lethargic.[52]  Mr. Davis acknowledged that his recollection of specific events may not be exact due to his low blood sugar.[53]  In any event, Turn Key personnel provided food and glucose tablets to Mr. Davis, which elevated Mr. Davis's blood-sugar level to 89 within ten minutes of the fall.[54]

A Turn Key "muscular skeleton/sprain report indicates that after Mr. Davis's fall, his foot was turned completely to the right and dislocated at the ankle."[55]  At some point, Mr. Davis manipulated his "foot to a normal position."[56]  Turn Key staff then helped Mr. Davis back onto his

---

[48] Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 28.  A careful reader will recall that, in its March 2020 Order, the Court dismissed claims against Nurse Vester in part because there was no allegation that she was in the group of Turn Key responders.  *See supra* note 12 and accompanying text.  That subsequent discovery has revealed Nurse Vester to be part of this group does not affect the propriety of the Court's earlier dismissal decision.  Mr. Davis never sought to amend his Complaint on this point, and the time to do so has passed.

[49] Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 29.  The record is silent as to the role Lieutenant Sims played in this episode.  Lieutenant Sims is not a defendant in this action, and no allegations are made against Lieutenant Sims.

[50] *Id.* ¶ 32.

[51] *Id.* ¶ 30.

[52] Ex. B to Pl.'s Resp. to Statement of Facts (Doc. 39-1) at 3.

[53] *Id.*

[54] Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 31.

[55] *Id.* ¶ 33.

[56] Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 33) at 4; Ex. 2-A to Defs.' Statement of Facts (Doc. 34-2) at 12.  Mr. Davis denies repositioning his foot but presents no evidence to support his denial.  *See* Pl.'s Resp. to Defs.' Statement of Facts (Doc. 39) ¶ 34.  In his deposition, Mr. Davis testified that he cannot recall manipulating his foot and conceded that he may have.  Ex. B to Pl.'s Resp. to Defs.' Statement of Facts (Doc. 39-1) at 4.  Because Mr. Davis does not support this denial, the Court finds that it is undisputed that Mr. Davis manipulated his foot back into its proper position.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion.").  In any event, even if someone else manipulated Mr. Davis's foot back to the proper position, it is undisputed that his foot was in the proper position before he returned to his cell.

feet and assisted him into his cell.[57]  While returning to his cell, Mr. Davis limped on his right leg.[58]  After returning Mr. Davis to his cell, Turn Key staff cleared Mr. Davis to remain on the unit.[59]  PCRDF staff then called a "Code 1 ('return to normal operations') at approximately 5:35 a.m."[60]

The parties dispute the treatment Mr. Davis received over the course of the next week.[61] The County Defendants assert that on the day of the incident, "Turn Key staff instructed Mr. Davis to apply cold compresses/ice packs for 20 minutes every three hours for 24 hours, to elevate his foot for three days, and to call medical personnel if he experienced any signs or symptoms (presumably of hypoglycemia)." [62]  The County Defendants also assert that on September 23, 2017 (the day after the fall), Mr. Davis "told Turn Key staff he twisted his ankle and felt a pop with rotation and another pop when he moved the ankle back into place."[63]  And according to Turn Key's records, a staff member indicated that Mr. Davis could put weight on his ankle, though with pain, and "noted [Mr.] Davis'[s] ankle was severely swollen with edema down to his toes, [subject to] pain on palpitation," and was red.[64]  Turn Key staff, according to the County Defendants, provided Mr. Davis ibuprofen as well.[65]  Mr. Davis denies all of the above.[66]  According to Mr.

---

[57]  Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 35.

[58]  *Id.* ¶ 35.

[59]  *Id.* ¶ 36.

[60]  *Id.* ¶ 37.  Twenty-two minutes elapsed from the time Mr. Davis fell until he was cleared to remain on the unit.

[61]  The Court presents these disputed facts for context but finds that they are immaterial to Mr. Davis's claims against the County Defendants.  At oral argument, Mr. Davis's counsel conceded that Mr. Davis's claims against Deputy Dillard and Sergeants Nelson and McEwen necessarily stem only from the September 22, 2017 incident because there is no record evidence that any of these individuals had any further interactions with Mr. Davis after that incident or had any knowledge of his subsequent treatment or nontreatment.  June 14, 2021 Hr'g Tr. at 17–19.

[62]  Defs.' Statement of Facts (Doc. 34) ¶ 38.

[63]  *Id.* ¶ 39.

[64]  *Id.* ¶¶ 40, 41.

[65]  *Id.* ¶ 42.

[66]  Pl.'s Resp. to Statement of Facts (Doc. 39) ¶¶ 38–42.

Davis, he did not receive ibuprofen or ice.[67]  He also states that he was never given anything that would have allowed him to elevate his ankle.[68]  Mr. Davis also denies seeing any Turn Key staff on September 23, 2017.[69]

Mr. Davis made multiple attempts to receive further medical attention for his ankle.  On September 27, 2017, Turn Key received a "Sick Call" request from Mr. Davis.[70]  In that request, Mr. Davis complained about "medical['s]" lack of concern for Mr. Davis's injuries.[71]  On September 27, 2017, Mr. Davis filed a grievance.[72]  Mr. Davis grieved the medical department's lack of concern and also complained that he had not received an X-ray of his ankle.[73]  Mr. Davis filed a second grievance on September 29, 2017, contending that he "fell and sprong [sic] my right ankle out of socket, and [it] was swollen badly.  As of this date 9-29-17[,] medical hasn't made any type of effort to X-ray."[74]  In response to this second grievance, a PCRDF staff member, Sergeant Brawley, told Mr. Davis that "the matter would be investigated."[75]

On the same day, Turn Key performed an X-ray on Mr. Davis's ankle, which revealed that Mr. Davis's fibula was fractured.[76]  Mr. Davis was transported to the University of Arkansas for Medical Sciences (UAMS).[77]  UAMS diagnosed Mr. Davis as having a fracture in his right fibula.[78]

---

[67]  *Id.* ¶ 42.

[68]  *Id.*

[69]  *Id.* ¶ 40.

[70]  Ex. I to Pl.'s Resp. to Statement of Facts (Doc. 39-1) at 45.

[71]  *Id.*

[72]  Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 44; *see also* Ex. F to Pl.'s Resp. to Statement of Facts (Doc. 39-1) at 41.

[73]  Ex. F to Pl.'s Resp. to Statement of Facts (Doc. 39-1) at 41.

[74]  Ex. F to Pl.'s Resp. to Statement of Facts (Doc. 39-1) at 42.

[75]  Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 55.

[76]  Exs. D and E to Pl.'s Resp. to Statement of Facts (Doc. 39-1) at 39–40.

[77]  Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 69.

[78]  Ex. 2-A to Defs.' Statement of Facts (Doc. 34-2) at 21 (showing Mr. Davis's diagnosis as a closed displaced

UAMS applied a splint to Mr. Davis's fracture and recommended orthopedic surgery.[79]   On October 18, 2017,[80] Turn Key submitted a request to UAMS regarding Mr. Davis's follow-up appointment and was informed by UAMS, on October 24, 2017, that a referral was required before an appointment could be made.[81]   Turn Key provided the referral on October 24, 2017,[82] and Mr. Davis's next appointment was scheduled for October 31, 2017.[83]   On October 28, 2017, however, Mr. Davis was transferred to UAMS to receive a new splint because his cast got wet.[84]   Three days later, Mr. Davis was again transferred to UAMS for his follow-up appointment when it was noted that Mr. Davis needed surgery "ASAP."[85]

On November 9, 2017, Mr. Davis was placed in the custody of the Arkansas Department of Correction ("ADC") and transferred to the Ouachita River Unit of the ADC.[86]   On November 17, 2017, Mr. Davis underwent surgery at UAMS.[87]   On April 17, 2018, the UAMS Orthopedic Clinic advised Mr. Davis that his fracture was not healing well and presented Mr. Davis with two options: either undergo a second surgery or allow the bone to heal knowing that an ankle fusion would likely be required in the future.[88]   Mr. Davis chose the latter.[89]   Mr. Davis was released by

---

fracture of lateral malleolus of right fibula initial encounter).

[79]   Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 71.

[80]   The record indicates that Mr. Davis had an appointment scheduled for October 10, 2017, at UAMS.  *Id.* ¶¶ 82–86. At oral argument, counsel for the County Defendants stated that Mr. Davis's sister was possibly aware of the appointment date.  June 14, 2021 Hr'g Tr. at 12.  Counsel further represented that PCDRF policy requires cancellation of outside appointments when "somehow somebody on the outside" is aware of the appointment date because such knowledge increases the risk for escape.  *Id.* at 10–11.

[81]   Pl.'s Resp. to Statement of Facts (Doc. 39) ¶¶ 77, 78.

[82]   *Id.* ¶ 79.

[83]   *Id.* ¶ 87.

[84]   *Id.* ¶ 88.

[85]   *Id.* ¶ 89.

[86]   *Id.* ¶ 93.

[87]   Pl.'s Resp. to Statement of Facts (Doc. 39) ¶¶ 94, 95.

[88]   *Id.* ¶¶ 100, 101.

[89]   *Id.* ¶ 102.

the ADC on August 1, 2018.[90]  Nearly four months later, Mr. Davis's lower right leg was amputated.[91]

## IV. <u>Discussion</u>

As described in the Facts section, there are some genuine disputes of fact in this case.  For instance, did Mr. Davis receive ibuprofen and ice?  Those disputes, however, are not material.  Even taking all of the disputed facts in the light most favorable to Mr. Davis (and giving him the benefit of all reasonable inferences therefrom), no rational juror could conclude that the County Defendants violated Mr. Davis's Eighth Amendment rights.  Mr. Davis's claims against the County Defendants therefore fail at the summary judgment stage.

### A. <u>Individual Claims</u>

Mr. Davis asserts that Deputy Dillard and Sergeants McEwen and Nelson, in their individual capacities, violated his Eighth Amendment rights and are therefore liable to him under 42 U.S.C. § 1983.  "Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment."[92]  To establish deliberate indifference, Mr. Davis must "show: '(1) he suffered from an objectively serious medical need, and (2) that [the County Defendants] knew of the need yet deliberately disregarded it.'"[93]  "Deliberate indifference is more than negligence, more even than gross negligence."[94]  This standard presents a "fact-intensive inquiry that requires [Mr. Davis] to clear a substantial

---

[90] *Id.* ¶ 104.

[91] *Id.* ¶ 105.

[92] *Johnson v. Leonard*, 929 F.3d 569, 575 (8th Cir. 2019) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

[93] *Id.* (citing *Estelle*, 429 U.S. at 104).

[94] *Id.* (quoting *Fourte v. Faulkner Cty*, 746 F.3d 384, 387 (8th Cir. 2014)); *see also Holden v. Hirner,* 663 F.3d 336, 343 (8th Cir. 2011) ("The level of culpability required to demonstrate deliberate indifference on the part of prison officials is equal to criminal recklessness.").

evidentiary threshold to succeed on his claim."[95]  For the purposes of this Motion, the Court assumes that Mr. Davis's fall and subsequent ankle injury gave rise to a serious medical need.  The Court also notes that Mr. Davis's individual capacity claims are cabined to the County Defendants' conduct on the morning of September 22, 2017.[96]

The Court begins with Sergeants McEwen and Nelson.  The undisputed facts show that these officers responded to Deputy Dillard's call for help and provided additional security.[97]  That is it.  The County Defendants note that neither Sergeant McEwen's nor Sergeant Nelson's incident report mentioned Mr. Davis's ankle.[98]  Mr. Davis does not contest this.  Indeed, at the motion hearing, Mr. Davis's counsel conceded that the record is silent as to whether Sergeant Nelson or Sergeant McEwen saw Mr. Davis's ankle after the fall.[99]  The Court's independent review of the record found no evidence indicating that either Sergeant McEwen's or Sergeant Nelson's role in the incident went beyond the singular purpose of securing the scene while Turn Key staff assessed Mr. Davis's medical needs.[100]  There is no evidence that they saw Mr. Davis's ankle or knew any specifics of his injury.  And there is no evidence that they had any knowledge of or interaction with Mr. Davis after this event.  The Court finds that Sergeants McEwen and Nelson are entitled to summary judgment.[101]

---

[95] *Id.* at 576 (internal quotations omitted).

[96] *See supra* note 61.

[97] Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 29.

[98] Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 33) at 12; *see also* Ex. 1-K to Defs.' Statement of Facts (Doc. 34-1) at 29 (indicating that Sergeant McEwen noticed Mr. Davis holding his head and making no mention of Mr. Davis's ankle injury); Ex. 1-L to Defs.' Statement of Facts (Doc. 34-1) at 30 (indicating that Sergeant Nelson arrived to the scene and provided security and making no mention of Mr. Davis's ankle injury).

[99] June 14, 2021 Hr'g Tr. at 16.

[100] In Mr. Davis's Amended Brief in Support in Opposition, Mr. Davis asserts that Sergeants McEwen and Nelson "saw that the plaintiff's ankle was severely swollen." Pl.'s Am. Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 42) at 4.  Mr. Davis provides no citation to the record indicating that such is the case.

[101] Even if Mr. Davis could establish the knowledge element with respect to Sergeant McEwen or Sergeant Nelson, summary judgment would still be appropriate for the same reasons the Court sets forth below in its analysis of the

Deputy Dillard was on the scene when Mr. Davis fell. The Court assumes that Deputy Dillard knew that Mr. Davis's ankle was initially dislocated, that it had to be manipulated back into the right position, that Mr. Davis was limping on his right leg when he was returned to his cell, and that his ankle was swollen. Could this lead a rational juror to conclude that Deputy Dillard's conduct went beyond "gross negligence" or was otherwise "so inappropriate as to evidence intentional maltreatment?"[102] No. It is undisputed that, in accordance with PCRDF policy, Deputy Dillard immediately summoned medical care professionals after Mr. Davis fell.[103] Five Turn Key staff members responded to the situation within minutes and assumed control over Mr. Davis's medical care. Deputy Dillard remained on the scene while Turn Key assessed Mr. Davis and she saw Mr. Davis walk, albeit with assistance and a limp, back into his cell. Turn Key medical professionals made the decision that Mr. Davis could remain in his cell without the need for more extensive treatment or evaluation in the infirmary at that moment. Mr. Davis does not present facts showing that Deputy Dillard's conduct during this incident was unreasonable, let alone approached criminal recklessness or intentional misconduct.[104] No facts establish that Deputy Dillard disregarded Mr. Davis's plight.

Moreover, no rational juror could conclude that Deputy Dillard knew or should have known that the Turn Key staff was somehow acting egregiously and in a manner that would cause Mr. Davis pain and suffering sufficient to rise to the level of a constitutional violation. There is no evidence that Mr. Davis told Deputy Dillard that he needed additional medical care during or after the incident or that he was in some sort of extreme pain after returning to his cell. This isn't

---

claims against Deputy Dillard.

[102] *Fourte*, 746 F.3d at 387.

[103] Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 33) at 11.

[104] *See Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (stating that "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause").

a situation where the medical staff refused to treat someone, leaving them in obvious, excruciating pain from something like a compound fracture with bone protruding through the skin, a gunshot wound, or a severed limb. Deputy Dillard did not commit deliberate indifference by relying on Turn Key's medical views in the specific circumstances. No rational juror could conclude otherwise.

Even if the Court concluded that Deputy Dillard violated the U.S. Constitution, it would still grant summary judgment to Deputy Dillard based on the second prong of the qualified immunity test. The Eighth Circuit explains that, "[a]t summary judgment, qualified immunity shields a law enforcement officer from liability in a § 1983 action unless: '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'"[105] Under Supreme Court precedent, a right is clearly established when "'[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'"[106] To show this, the Eighth Circuit states that "[a] plaintiff need not cite a case directly on point, but controlling authority or a robust consensus of cases of persuasive authority must have put the statutory or constitutional question beyond debate as of the date of the alleged violation."[107]

Here, Mr. Davis argues that his right to have his serious medical needs addressed by the County Defendants was clearly established.[108] True, but not dispositive. The Eighth Circuit has made clear that, in the qualified immunity context, "[t]he dispositive question is whether the

---

[105] *Barton v. Taber*, 908 F.3d 1119, 1123 (8th Cir. 2018) (quoting *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009)).

[106] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (brackets in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[107] *Hamner v. Burls*, 937 F.3d 1171, 1176 (internal quotations omitted) (quoting *al-Kidd*, 563 U.S. at 741–42).

[108] Pl.'s Am. Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 42) at 23.

violative nature of *particular* conduct is clearly established."[109]  To answer this question, the Eighth Circuit instructs the Court to "do more than determine that the law was 'clearly established' in the abstract."[110]  Instead, the Court must "examine the information possessed by . . . [Deputy Dillard] . . . to determine whether, given the facts known to [her] at the time, a reasonable [jailer] would have known that [her] actions violated the law."[111]  This doesn't mean Deputy Dillard's exact conduct must have been deemed unconstitutional before September 22, 2017, but it does mean that, "in the light of preexisting law[,] the unlawfulness must be apparent."[112]  To be frank, determining the right level of fit to require of a precedent is more art than science.

Mr. Davis has not directed the Court's attention to any on-point precedent that would have put Deputy Dillard on notice that her actions violated clearly established law.[113]  The Court has not found any either.  What precedent would tell Deputy Dillard that it was unconstitutional not to second guess the medical staff's treatment decision concerning a sprained, dislocated, or broken ankle?

Deputy Dillard responded immediately to Mr. Davis's fall.  She summoned Turn Key for medical assistance.  She remained on the scene while five trained medical professionals assessed

---

[109] *Hamner*, 937 F.3d at 1178 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).

[110] *Langford v. Norris*, 614 F.3d 445, 461 (8th Cir. 2010) (quoting *Reece v. Groose*, 60 F.3d 487, 491 (8th Cir. 1995)).

[111] *Id.* (quoting *Miller v. Schoenen*, 75 F.3d 1305, 1308 (8th Cir. 1996)).

[112] *Id.* (quoting *Anderson*, 483 U.S. at 640).

[113] Mr. Davis has marshaled cases in support of his position, but those cases are inapposite.  For instance, at the motion hearing, Mr. Davis's counsel raised the Supreme Court's decision in *West v. Atkins*, 487 U.S. 42 (1988).  June 14, 2021 Hr'g Tr. at 19.  Mr. Davis's counsel aptly described the case as addressing whether a physician was acting under "color of law" for purposes of section 1983 liability.  *Id.*  But the question answered in *West* has no bearing on whether the County Defendants' conduct here violated clearly established constitutional law.  Mr. Davis's counsel also adverted to an unpublished district court case, *Trujillo v. Corizon Health et al.*, No. 17-cv-1633 (PJS/ECW), 2019 WL 1409331 (D. Minn. Mar. 28, 2019).  This case involved some facts that are similar to the case at bar (namely delayed care for a broken bone), but the suit itself was against medical providers and not jailers.  *Trujillo*, 2019 WL 1409331, at *1.  So, even if the case were binding on the Court, the factual distinctions render this an inappropriate case for the proposition that the jailers here violated Mr. Davis's clearly established constitutional rights.

Mr. Davis and concluded that he could remain in his cell. Perhaps the medical personnel negligently attended to Mr. Davis's needs, but that negligence cannot be imputed to Deputy Dillard.[114] And even if it could, "[m]ere negligence in diagnosing or treating a medical condition does not rise to the level of an Eighth Amendment violation."[115] Certainly, in all but the most obvious cases, Deputy Dillard is entitled to rely on the Turn Key medical experts. And after Turn Key returned Mr. Davis to his cell, Deputy Dillard's involvement in Mr. Davis's care came to an end. There is no evidence that Deputy Dillard and Mr. Davis ever interacted in any way again, or that Deputy Dillard had any knowledge of Mr. Davis's subsequent treatment or nontreatment. At most, Deputy Dillard made a mistake in trusting Turn Key staff's initial assessment, but the Eighth Circuit makes clear, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."[116] The Court is not convinced that the record evidence shows that Deputy Dillard even made a bad guess.[117] In any event, the Court finds that Deputy Dillard is entitled to qualified immunity because she did not transgress a bright line. It was not clearly established at the time of Mr. Davis's fall (or now) that Deputy Dillard's conduct violated the Eighth Amendment.

---

[114] *Langford*, 614 F.3d at 460.

[115] *Hamner*, 937 F.3d at 1177; *see also Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006) (stating that a one-month delay between a nurse's tentative diagnosis of a hand fracture and an X-ray confirming the fracture constituted negligence and not deliberate indifference).

[116] *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

[117] At the motion hearing, when the Court asked Mr. Davis's counsel what Deputy Dillard should have done, Mr. Davis's counsel responded that Turn Key's deficient response should have been a red flag to Deputy Dillard. June 14, 2021 Hr'g Tr. at 20–21. Mr. Davis's counsel also said that Deputy Dillard should have reported the incident to her supervisor. *Id.* at 21. Presumably, the supervisor would have done the same thing Deputy Dillard did: call Turn Key personnel, who had already assessed and cleared Mr. Davis to return to his cell.

B. <u>Official Capacity Claims</u>

Mr. Davis's official capacity claims fail for at least two independent reasons. First, as stated above, Mr. Davis cannot establish a constitutional violation based on the record facts. And second, assuming a constitutional violation did occur, Mr. Davis has not directed the Court to any Pulaski County custom, policy, or practice that caused the alleged violation.

The Eighth Circuit holds that "a suit against a governmental official in his or her official capacity is 'another way of pleading an action against an entity of which an officer is agent.'"[118] As such, Pulaski County "is the real party in interest" with respect to Mr. Davis's official capacity claims.[119] So, Mr. Davis's official capacity claims against the County Defendants are properly analyzed as claims against only Pulaski County.

A county is subject to liability under § 1983 "only where a constitutional violation has been committed pursuant to an official custom, policy, or practice."[120] This means that a plaintiff "must show not only that a policy or custom existed, and that it was causally related to the plaintiff's injury, but that the policy itself was unconstitutional."[121] Said differently, an official "custom, policy, or practice must be the moving force behind the violation."[122] The Eighth Circuit draws a distinction between a custom and a policy.[123] "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority

---

[118] *Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007) (quoting *Monell v. Dep't of Social Services*, 436 U.S. 658, 690 n. 55 (1978)).

[119] *Id.* (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991)).

[120] *Luckert v. Dodge County*, 684 F.3d 808, 820 (8th Cir. 2012) (quoting *Johnson v. Blaukat*, 453 F.3d 1108, 1114 (8th Cir. 2006)).

[121] *Id.* (quoting *Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir. 1985)).

[122] *Id.* (quoting *Patzner*, 779 F.2d at 1367).

[123] *Corwin v. City of Independence, Mo*, 829 F.3d 695, 699–700 (8th Cir. 2016).

regarding such matters."[124]  A custom is different.  To prove that a custom exists, a plaintiff must demonstrate:

> (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.[125]

As an initial matter, Mr. Davis's official capacity claims fail because the facts, even when viewed in a light most favorable to Mr. Davis, could not lead a rational juror to find that an underlying predicate constitutional violation occurred.[126]  But even if the opposite were true, Mr. Davis still cannot survive summary judgment on his official capacity claims.

Mr. Davis's official capacity claims task the Court with divining what, exactly, his claims are.  Mr. Davis's Complaint fails to mention any policy, custom, or practice, let alone an unconstitutional one.[127]  Outside the Complaint, Mr. Davis has not pointed to any official policy that allegedly contributed to his injuries.[128]  Indeed, Mr. Davis concedes that Pulaski County has "policies and guidelines in place to ensure the provision of healthcare services."[129]  His argument

---

[124] *Id.* at 700 (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)).

[125] *Id.* (quoting *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014)).

[126] *See Corwin*, 829 F.3d at 700 ("[I]n light of our upholding the grant of summary judgment to the individual defendants on Corwin's underlying substantive claim, municipal liability cannot succeed as a matter of law.").

[127] *See* Pl.'s Compl. (Doc. 1).  Mr. Davis's Complaint alleges that "in an effort to avoid incurring [surgical medical expenses], the defendants 'fast-tracked' the plaintiff to the Arkansas Department of Corrections . . . ." *Id.* ¶ 38. The County Defendants address this allegation in their Brief in Support of Motion for Summary Judgment. Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 33) at 16.  Insofar as Mr. Davis is alleging that his being fast-tracked was some kind of custom or policy, the Court notes that there is no record evidence suggesting that Pulaski County had a widespread policy of "fast-tracking" inmates.  Also, no record evidence suggests that, even if a such a custom existed, this custom would be unconstitutional.

[128] At the motion hearing, Mr. Davis's counsel conceded that there was no official policy in the record.  June 14, 2021 Hr'g Tr. at 32.

[129] Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 7.

is that the policies and guidelines are not followed.[130]  As mentioned, it is the policy itself that must be the animating force behind a constitutional violation.  If a policy is not followed, the policy itself cannot be said to have brought about a constitutional violation.  Moreover, not following a policy is not "a policy" as the Eighth Circuit defines that term.[131]  So, in the absence of an official policy, the Court turns its focus, albeit briefly, to whether Mr. Davis can point to any disputed facts as to the existence of a custom upon which § 1983 liability can turn.

He cannot.  At the motion hearing, Mr. Davis's counsel suggested two theories as to how Mr. Davis's official capacity claims could proceed.[132]  First, Mr. Davis's counsel stated that Pulaski County took a hands-off approach to medical care thus providing grounds for *Monell* liability.[133]  The Court understands this argument to mean Pulaski County has a custom of deferring medical decisions to Turn Key.  Mr. Davis, however, has not alleged (or provided admissible evidence) that Pulaski County's hands-off approach was a "'continuing, widespread, persistent pattern of unconstitutional misconduct' in the form of denying emergency care to inmates in need of that care."[134]  At most, Mr. Davis has alleged "an isolated incident" of alleged misconduct, which "cannot, as a matter of law, establish a municipal policy or custom creating liability under § 1983."[135]  This theory of liability, therefore, does not provide Mr. Davis with a path to survive summary judgment.[136]

---

[130] *Id.*

[131] *See supra* note 124 and accompanying text.

[132] June 14, 2021 Hr'g Tr. at 25–27.

[133] *Id.*

[134] *Corwin*, 829 F.3d at 700 (quoting *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1061 (8th Cir. 2013)).

[135] *Id.* (quoting *Ulrich*, 715 F.3d at 1061).

[136] Additionally, even if Mr. Davis could establish a widespread pattern of unconstitutional conduct of which Pulaski County was aware, no record evidence exists to establish that the unconstitutional conduct caused Mr. Davis's injuries.  This is especially true with respect to Mr. Davis's amputation.  At most, assuming a constitutional violation occurred, damages would be available for the pain and suffering Mr. Davis experienced between September 22, 2017 (the date of the injury) and September 29, 2017 (the date Mr. Davis was transferred to UAMS

Second, Mr. Davis's counsel indicated that *Monell* liability can be based upon Pulaski County's lack of a policy regarding how county personnel should react in circumstances where a third-party medical provider fails to provide adequate care.[137]  The Court disagrees.  As mentioned above, "no policy" is not "a policy."  And, again, Mr. Davis has not alleged (or provided admissible evidence) that Pulaski County's lack of a policy is somehow unconstitutional.  Lack of a policy is also not fairly characterized as a custom.  As mentioned, for a custom to be a "custom" under Eighth Circuit precedent, it must be a "'continuing, widespread, persistent pattern of *unconstitutional* misconduct' . . . ."[138]  This theory, too, does not provide a path to avoid summary judgment here.

C.  Failure to Train

Finally, Mr. Davis asserts that Pulaski County failed to train its staff to "deal with the medical needs of its pre-trial detainees, and such failure to train amounted to deliberate indifference . . . ."[139]  At the outset, the Court notes the Supreme Court's admonition that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[140]  With that in mind, the Supreme Court has held that a municipality can "be liable under . . . § 1983 for constitutional violations resulting from its failure to train municipal employees."[141]  "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be

---

for treatment).  June 14, 2021 Hr'g Tr. at 22–23.  Mr. Davis's counsel tacitly conceded that the state of the record provides no causal link between any of the County Defendants' conduct on September 22, 2017 and Mr. Davis's amputation, which occurred over a year later.  *Id.* at 23.

[137] June 14, 2021 Hr'g Tr. at 27.

[138] *Corwin*, 829 F.3d at 700 (emphasis added) (quoting *Ulrich v. Pope Cty.*, 715 F.3d at 1061).

[139] Pl.'s Compl. (Doc. 1) ¶ 52.

[140] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

[141] *City of Canton, Ohio v. Harris*, 489 U.S. 378, 380 (1989).

properly thought of as a city 'policy or custom' that is actionable under § 1983."[142]  The Supreme

Court has also indicated that a "pattern of similar constitutional violations by untrained employees

is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."[143]

Finally, the Eighth Circuit has noted that a failure-to-train claim cannot stand if unsupported by an

underlying constitutional violation.[144]

Again, Mr. Davis has not made out an underlying constitutional violation, so his failure-

to-train claim is fatally flawed.  Moreover, Mr. Davis admits that

> [a]ll deputies at the PCRDF receive training including, but not
> limited to: administration of first aid; recognizing the need for
> emergency care in life threatening situations; recognizing acute
> manifestations of chronic illnesses; and methods of obtaining
> medical assistance and referring inmates to health professionals.[145]

This admission directly contradicts Mr. Davis's failure-to-train allegations.  That being the case, a

reasonable juror could not find for Mr. Davis on this claim.[146]

---

[142] *Id.* at 389.

[143] *Thompson*, 563 U.S. at 62 (quoting *Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)).

[144] *See Sanders v. City of Minneapolis, Minn.*, 474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* failure to train municipal liability.").

[145] Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 8.

[146] Aside from referencing another case out of the Eastern District of Arkansas, Mr. Davis has not presented a "pattern of similar constitutional violations."  *Thompson*, 563 U.S. at 61.  Mr. Davis referenced *The Estate of Sharon Alexander v. Pulaski Cty., Ark.* in Plaintiff's Response to Statement of Facts and at the motion hearing.  Pl.'s Resp. to Statement of Facts (Doc. 39) ¶ 7; June 14, 2021 Hr'g Tr. at 21.  Those references have not provided the Court with much information regarding that case.  In any event, assuming the facts in that case indicate a constitutional violation, that would not sway the Court because two incidents do not establish a continuous pattern of unconstitutional conduct.

### V. <u>Conclusion</u>

Defendants' Motion for Summary Judgment is GRANTED in its entirety.

IT IS SO ORDERED this 8th day of July 2021.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE